**UNITED STATES of America,
Plaintiff,**

v.

**Teddy Dean DAVIS, Defendant.**

**Criminal Action No. 5:08–cr–00103–01.**

United States District Court,
S.D. West Virginia,
Beckley Division.

Nov. 26, 2008.

Erik S. Goes, U.S. Attorney's Office, Charleston, WV, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

THOMAS E. JOHNSTON, District Judge.

Before the Court is Defendant Teddy Dean Davis's Motion to Suppress Evidence [Docket 47]. By Order of Reference entered May 7, 2008, pretrial motions, including the pending motion, were designated for referral to United States Magistrate Judge R. Clarke VanDervort for submission of proposed findings and recommendations (PF & R) in accordance with 28 U.S.C. § 636(b)(1)(B). Magistrate Judge VanDervort held an evidentiary hearing on Defendant's motion on July 29, 2008, and filed his PF & R on October 9, 2008. In that filing, the magistrate judge recommended that this Court deny Defendant's suppression motion in its entirety.

■■■ The Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). In addition, this Court need not conduct a de novo review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson,* 687 F.2d 44, 47 (4th Cir.1982). Here, objections to Magistrate Judge VanDervort's PF & R were due by October 27, 2008. Defendant filed timely objections to the PF & R on October 15, 2008.

## I. BACKGROUND

### A. Factual Background

The events preceding Defendant's arrest, which form the basis for his suppression motion, are subject to considerable dispute. Based on the averments of Defendant, the testimony at the July 29 hearing, and the findings of Magistrate Judge VanDervort, the relevant factual background is as follows.[1]

On April 10, 2008, Special Agent Michael A. Yansick of the Federal Bureau of Investigation (FBI) received a call from an agent in the FBI's Pittsburgh Division headquarters. The Pittsburgh agent informed Special Agent Yansick that a Kentucky resident reported that a person applied for a credit card using the Kentucky resident's name and that the address on the credit card application was room 107 of the Holiday Inn in Beckley, West Virginia. Special Agent Yansick contacted the Beckley Police Department and arranged to meet Corporal James H. Blume, III, at the Holiday Inn to investigate. Upon arriving at the hotel, Special Agent Yansick and Officer Blume spoke with the manager at the front desk. The manager showed them a copy of the room registration form. The form indicated that the room was rented in one name, but that the name had been changed thereafter to that of the Kentucky resident. The manager proceeded to escort Special Agent Yansick and Officer Blume to room 107. The officers knocked on the door and received no response. The manager opened the door for them and they entered the room announcing that they were police officers. The officers' stated purpose for entering

1. The factual background and testimony at the evidentiary hearing are set forth in greater detail in the PF & R.

the room was to check for the presence of the suspects and to ensure that they were not destroying evidence.[2] The officers testified that they were in the room approximately ten to fifteen seconds and that no evidence was observed or seized at that time. The manager's testimony differed somewhat, and he estimated that the officers were in the room "three to five minutes at tops." (Tr. at 14.)[3] There is no indication from the manager's testimony that any evidence was taken on April 10. The officers left the room and informed the manager that they would return the following day.

The next day, April 11, Special Agent Yansick returned to the Holiday Inn accompanied by his partner, Special Agent Terry Schwartz, and Detectives Frank Priddy and Samuel L. McClure, Jr., of the Beckley Police Department. The officers went to the front desk and learned that the suspects continued to rent the room and were believed to be on the property at that time. The four officers proceeded to room 107. Special Agent Yansick knocked once. Detective Priddy knocked a second time much louder. From inside the room a voice asked, "Who is it?" Special Agent Yansick and Detective Priddy answered "FBI" and "Police," respectively. (Tr. at 37, 140.) Defendant opened the door slightly with the security latch engaged and asked the officers what they wanted. Special Agent Yansick and Detective Priddy showed Defendant their credentials and

asked to come in and speak with Defendant. Defendant closed the door, disengaged the security latch, and reopened the door. The officers then entered the room.[4]

What transpired immediately after the officers entered the suite differs in the accounts of the officers and Defendant. According to Defendant, Special Agent Yansick crossed the threshold and remained in the sitting room with Defendant. The three other officer immediately "went running to the back bedroom." (Tr. at 180.) Detective McClure allegedly had his firearm drawn. Defendant claims that the allegedly stolen and/or fraudulently obtained mail—the evidence Defendant seeks to suppress—was hidden in the hallway closet. Detective Priddy opened the closet twice, according to Defendant, removing the mail the second time. Defendant states that at no time did he consent to a search of the hotel suite until after the incriminating evidence had been discovered.

The officers' separate descriptions of their entry into the room were substantially similar. According to the officers, they entered the suite and Special Agent Yansick asked if there was anyone else in the hotel. Defendant acknowledged that there was a second person present and gestured toward the bedroom. At that point, Special Agent Schwartz and Detectives Priddy and McClure went to the back bedroom for the purpose of "officer safety"—that is, to ensure that the second suspect was not

2. Magistrate Judge VanDervort found that the April 10, 2008, warrantless entry into Defendant's hotel room was not supported by exigent circumstances and therefore was unconstitutional. (Docket 65 at 18.) Neither the government nor Defendant objected to this finding, apparently because no evidence was uncovered. Nonetheless, this Court cannot and does not condone this type of constitutional violation.

3. The copy of the transcript available to the Court and cited herein is the court reporter's rough draft.

4. The hotel room was a three-room suite. The first room was a sitting room where the officers initially encountered Defendant. Opposite the entrance and across the sitting room was a short hallway which led to a bedroom and bathroom. There were two beds in the bedroom. There was a closet in the hallway and one in the bedroom.

a threat. (Tr. at 112, 142.) The officers observed Brian Hoffman under a sheet in one of the room's two beds. He cooperated when they told him to show his hands. The officers all claim to have observed a blue canvas satchel and a trash can overflowing with mail at or near the foot of the bed occupied by Hoffman. The mail, which appeared to be addressed to many different people, was spilling out onto the floor. A computer also was observed at or near the foot of the unoccupied bed.

The testimony given by the officers and Defendant are substantially similar as to other events that occurred shortly after the entry. Special Agent Yansick asked Defendant his name, and Defendant replied with the name of the Kentucky resident. Special Agent Yansick responded that he knew that to be false because he had spoken with the Kentucky resident earlier. Defendant responded by giving Special Agent Yansick another false name, that of his brother. Soon thereafter, Hoffman, still in the bedroom, told the officers that Defendant's name was Teddy Davis. Upon being confronted with his real name, Defendant admitted his identity. A search of National Crime Information Center records revealed that Defendant was the subject of an outstanding warrant from Oklahoma and that Oklahoma intended to extradite Defendant.

After learning of the outstanding warrant, the officers asked for Defendant and Hoffman's permission to search the suite and their automobile. Both consented. The subsequent searches produced no evidence, aside from the previously discovered mail and computer. Defendant was then placed under arrest for the fugitive warrant. He was read his Miranda rights at the police station and invoked his right to remain silent.

On June 3, 2008, a grand jury returned a superseding indictment against Defendant and Hoffman for events occurring between April 5 and April 11, 2008. The seven-count indictment charges both defendants with three counts of mail fraud in violation 18 U.S.C. § § 1341; three counts of aggravated identity theft in violation of 18 U.S.C. §§ 1028A; and one count of possession of stolen mail in violation of 18 U.S.C. §§ 1708.

## B. Defendant's Suppression Motion

Defendant's motion seeks the suppression of all phone logs, United States mail, credit card applications, and other physical evidence seized from Defendant's hotel room on April 11, 2008. Defendant also moves for the suppression of the results of any forensic evaluation of the computer seized from the hotel room and of any United States mail delivered to the hotel room after April 11. Defendant asserts that the manner in which the evidence was obtained violated the Fourth Amendment in several respects. First, the phone log showing all outgoing calls from Defendant's hotel room was obtained on April 10, 2008, without a warrant. Second, Defendant maintains that the officers' search of Defendant's hotel suite on April 11, 2008, was unreasonable within the meaning of the Fourth Amendment because the officers had not obtained a warrant or consent for the search.[5] Lastly, Defendant argues that all evidence obtained subsequent to the April 11, 2008, entry into the hotel suite should be excluded under the fruit of the poisonous tree doctrine.

---

5. Defendant also states that the April 10, 2008, entry into Defendant's hotel suite was unlawful and that any evidence seized on that date should be suppressed. There is no indication that any evidence was seized from the suite on this date, however.

## II. DISCUSSION

Defendant lodges four objections to the PF & R, all of which stem from the "Government['s] fail[ure] to present sufficient evidence to satisfy any of the established exceptions to the Fourth Amendment warrant requirement." (Docket 66 at 2.) Defendant first argues that he did not consent to the initial search of the hotel suite. Defendant's second objection asserts the officers' protective sweep of the suite was not justified because Defendant was not under arrest when the sweep occurred. In his third objection, Defendant maintains that Hoffman did not give the officers consent to search. Defendant's last objection states that all evidence seized subsequent to the allegedly unlawful search should be excluded under the fruit of the poisonous tree doctrine. Defendant asserts no objections relating to the phone log evidence seized on April 10, 2008.

### A. Applicable Law

■■■ The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. This right restrains the power of law enforcement officers to conduct searches of places in which a person has a "legitimate expectation of privacy." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). A person's subjective expectation of privacy does not constitute a legitimate expectation of privacy unless society is prepared to recognize the reasonableness of the expectation. *See id.* at 142 n. 3, 99 S.Ct. 421. Courts have consistently held that people have a legitimate expectation of privacy in rented hotel rooms. *See, e.g., Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (holding that warrantless search of hotel room based on consent of hotel clerk is unconstitutional); *United States v. Kitchens,* 114 F.3d 29, 31 (4th Cir.1997); *United States v. Thomas,* 955 F.2d 207, 208 (4th Cir. 1992); *United States v. Arias,* 992 F.Supp. 832, 836 (S.D.W.Va.1997).[6]

■■■ A hotel occupant's privacy interest in the rented room does not preclude all law enforcement searches—it merely necessitates that those searches be reasonable. Warrantless searches are per se unreasonable unless the search falls within a valid exception. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct.

---

**6.** The legitimacy of a person's expectation of privacy in a hotel room is diminished if the room was obtained by fraud—as it is alleged to have been in this case. *See United States v. Bruce,* 396 F.3d 697, 709 n. 7 (6th Cir.2005) (noting that a defendant's use of an alias to obtain a hotel room lessened his privacy interest); *United States v. Cunag,* 386 F.3d 888, 894–95 (9th Cir.2004) (stating that a person's privacy interest in a fraudulently obtained hotel room is diminished, but not extinguished until the hotel owner takes affirmative acts to evict the occupant); *United States v. Wai–Keung,* 845 F.Supp. 1548, 1562 (S.D.Fla.1994) (finding no reasonable expectation of privacy where defendants obtained hotel room with stolen credit card); *c.f. Rakas,* 439 U.S. at 143 n. 12, 99 S.Ct. 421 ("A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.' "). However, it has not been established in the Fourth Circuit whether a person who has procured a hotel room by fraudulent means has a sufficient privacy interest to exclude law enforcement officers. The question of whether Defendant had a legitimate expectation of privacy in the hotel suite has not been adequately briefed and the Court need not decide it because the suppression motion may be disposed of on other grounds. Accordingly, the Court assumes, but does not decide, that Defendant had a legitimate expectation of privacy in his hotel suite.

2041, 36 L.Ed.2d 854 (1973). Several long-standing exceptions are implicated in this case: searches based on consent, protective sweeps, and the plain view doctrine. For searches based on consent, law enforcement officers do not need a warrant to conduct a search if the subject of the search waives his Fourth Amendment rights and voluntarily consents to a search. *See id.* at 227, 93 S.Ct. 2041; *Ferguson v. City of Charleston,* 308 F.3d 380, 396 (4th Cir.2002). Regarding protective sweep searches, law enforcement officers do not violate the Fourth Amendment when they are lawfully on a premises and conduct a "quick and limited" search "confined to a cursory visual inspection of those places in which a person might be hiding" who may endanger the officers. *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The plain view doctrine is not as much an independent exception to the warrant requirement as it is a complement to the exceptions. *See Arizona v. Hicks,* 480 U.S. 321, 325, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). Under the plain view doctrine, officers may seize incriminating evidence observed in plain view, provided that the officers' presence in the location is justified by a warrant or by a recognized warrant exception. *See Horton v. California,* 496 U.S. 128, 135, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Jackson,* 131 F.3d 1105, 1109 (4th Cir.1997).

■ Because warrantless searches are presumably unlawful, the government bears the burden of proving that one of the valid exceptions applies to the circumstances. *See United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) ("[T]he burden is on those seeking the [warrant] exemption to show the need for it . . . ."); *see also United States v. Gwinn,*

219 F.3d 326, 335 (4th Cir.2000); *United States v. Morrow,* 731 F.2d 233, 235–36 (4th Cir.1984). It is axiomatic that the government need only demonstrate the applicability of one warrant exception to justify a warrantless search. The showing of a valid warrant exception has important consequences for the government because a law enforcement officer's power to seize incriminating evidence in plain view is contingent on the officer's rightful presence in the locus. *See Horton,* 496 U.S. at 135, 110 S.Ct. 2301.

■ The judicially fashioned remedy for Fourth Amendment violations is the exclusion of the unlawfully seized evidence from a defendant's trial. *See Hudson v. Michigan,* 547 U.S. 586, 590–91, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006); *see also Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). To increase the deterrent effect of the exclusionary rule, evidence subsequently "obtained as a direct result of an unconstitutional search or seizure" is excluded from trial as "fruit of the poisonous tree." *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)). Of course, evidence obtained by law enforcement officers after an identifiable Fourth Amendment violation has occurred is not excludable as fruit of the poisonous tree if the evidence had not been obtained "by exploitation of that illegality[, but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### B. Defendant's Objections

Although Defendant asserts four separate objections to Magistrate Judge Van-Dervort's PF & R, only one needs to be addressed in detail. The second objection

states that the protective sweep conducted by the officers within moments of their entry into Defendant's hotel suite was not justified because the officers were in the room with Defendant's consent and Defendant was not yet in custody. As stated above, law enforcement officers need only demonstrate one applicable warrant exception to justify the seizure of evidence discovered in plain view. Thus, if a protective sweep that is justified and properly limited in scope reveals inculpatory evidence, it is immaterial that the officers did not obtain consent to seize the items. For this reason, Defendant's first and third objections—each of which alleges a failure to obtain consent—are inconsequential if the protective sweep was valid. Likewise, a finding that the officers' actions on April 11, 2008, were lawful is determinative of Defendant's fourth objection that all subsequently obtained evidence should be excluded as fruit of the poisonous tree.

### 1. Protective Sweep Objection: Relevant Law

Notwithstanding the conflicting testimony regarding the details of the officers' entry into Defendant's hotel suite, it is undisputed that three of the officers conducted a protective sweep of the suite prior to Defendant's arrest. It is also agreed that the officers' entry into the suite was in response to Defendant's consent. Therefore, the question presented by Defendant's second objection is whether the officers' protective sweep was a reasonable search under the Fourth Amendment given that (1) it occurred prior to arrest, and (2) that the officers' presence in the suite was based on consent. Defendant argues that the protective sweep was unreasonable for each of these reasons.

The Supreme Court, in *Maryland v. Buie*, found that a protective sweep of a suspect's home may be reasonable under the Fourth Amendment in certain circumstances. 494 U.S. 325, 336–37, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). In *Buie*, law enforcement officers entered the defendant's home to execute an arrest warrant and found the defendant hiding in the basement. *Id.* at 238, 110 S.Ct. 1093. Following the defendant's arrest, an officer entered the basement to ensure that no one else was hiding there. *Id.* Inculpatory evidence—a red running suit the defendant wore to commit an armed robbery—was observed lying on a stack of clothing and seized. *Id.*

The *Buie* opinion relied heavily on the reasoning in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long*, 463, U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). *Terry* announced the balancing test to be applied to determine if a particular law enforcement search is reasonable under the Fourth Amendment. *See Terry*, 392 U.S. at 21, 88 S.Ct. 1868. The competing interests to be balanced are a suspected individual's right to be free from unwarranted invasions of his personal liberty and the need for law enforcement officers to protect themselves and others. *See id.* at 24, 88 S.Ct. 1868. In order to strike the appropriate balance between these two interests, the *Terry* Court advised reviewing courts to apply an objective standard to challenged searches: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. 1868. Stated simply, the standard is whether the officer had a reasonable articulable suspicion of a threat that justified the search. *Long* extended this principle to the passenger compartment of suspects' automobiles and *Buie* extended it suspects' homes. Thus, the Supreme Court held in *Buie*

that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long*, and as in those cases, we think this balance is the proper one.

*Buie*, 494 U.S. at 334, 110 S.Ct. 1093.

The facts of this case are distinguishable from *Buie* in that the officers in this case were in Defendant's hotel suite with his consent and that he was not under arrest at the time of the protective sweep. Defendant argues that *Buie*'s holding should be limited to protective sweeps conducted as part of searches incident to arrest. Several courts have addressed factual situations similar to the case at bar in light of *Buie*, but the Fourth Circuit is not among them. Unsurprisingly, these authorities are split as to whether law enforcement actions similar to those in this case are reasonable. This may be due, in large part, to the inherently fact-based nature of the balancing test. The reasoning in these cases is instructive nonetheless.

The Eighth, Ninth, and Tenth Circuits have held that a protective sweep may be performed only as part of a search incident to arrest. *See United States v. Torres–Castro*, 470 F.3d 992, 997–98 (10th Cir. 2006); *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir.2005); *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir.2000); *see also United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir.2007) (noting that a protective sweep not incident to arrest may be justified only by exigent circumstances). This rule has been relaxed somewhat, however, and courts have held that a protective sweep is permissible as a search incident to arrest if "a legitimate basis for the arrest existed before the search, and . . . the arrest followed shortly after the search." *Torres–Castro*, 470 F.3d at 998 (citation omitted).

Other courts have extended *Buie* protective sweeps to other non-arrest situations. The First Circuit has held that "police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry." *United States v. Martins*, 413 F.3d 139, 150 (1st Cir.2005); *accord United States v. Legette*, 260 Fed.Appx. 247, 249–50 (11th Cir.2008) (unpublished); *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir.2001). In arriving at this holding, the First Circuit noted in *Martins* that "the key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk." *Martins*, 413 F.3d at 150. Similarly, the Second Circuit has held that "specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant." *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005). The Fifth Circuit has recognized that non-arrest situations may pose a *greater* risk to law enforcement officers' safety because the suspect is not in custody. *United States v. Gould*, 364 F.3d 578, 584 (5th Cir.2004) (citing *Long*, 463 U.S. at 1051, 103 S.Ct. 3469). Thus, non-arrest law enforcement entries into premises "give rise to equally reasonable suspicion of equally serious risk of danger of officers

being ambushed by a hidden person as would be the case were there an arrest." *Id.*

Among the courts that have permitted protective sweeps not incident to arrest, a common requirement is that the law enforcement officers must on the premises lawfully. This includes situations in which the officers have entered a home with the consent of the owner. *See, e.g., Taylor,* 248 F.3d at 513. For example, in *United States v. Gould,* law enforcement officers went to a dangerous suspect's home without a warrant to conduct a "knock and talk" investigation. 364 F.3d at 590. A resident of the home invited the officers in and told them that the suspect was asleep in his bedroom. *Id.* at 580. The officers did not see the suspect in the bed and conducted a protective sweep of the room in order to locate the suspect. *Id.* In the process of looking under the bed and in two closets, rifles were discovered and seized. *Id.* The Fifth Circuit observed that although "protective sweeps following a consent entry may in certain circumstances pose Fourth Amendment concerns not present in cases where the initial entry is pursuant to a warrant," *Buie*'s reasonableness standard still applies to the officers' conduct. *Id.* at 589–90.

### 2. Protective Sweep Objection: Analysis

 As a threshold matter, the Court is not persuaded by Defendant's argument that a protective sweep can be conducted only as part of a search incident to arrest. Based on the cases cited above, it appears that Defendant's argument has been adopted by three courts of appeals,[7] but it has been rejected by at least five.

In the absence of guidance from the Fourth Circuit, this Court is inclined to side with the weight of authority. Moreover, the courts that have rejected arguments similar to Defendant's are more in line with the Supreme Court's reasoning in *Buie, Terry,* and *Long.* The competing interests balanced by the *Buie* Court—a suspect's right to be free from unwarranted intrusions and law enforcement officers' safety—are no less present because a suspect is not under arrest. Obviously, a suspect's privacy interest is equally present whether he is being arrested or merely questioned by the police. Likewise, law enforcement officers may be at risk from unknown threats whether they are in a home to execute a search warrant or to speak with a suspect. As some courts have noted, *see, e.g., Gould,* 364 F.3d at 584, law enforcement officers may, in certain circumstances, be at greater risk from hidden dangers where a suspect is not in custody; in such situations the officers may be preoccupied with the unrestrained and potentially dangerous suspect while undisclosed persons are planning an ambush elsewhere in the residence. Precluding officers from conducting protective sweeps of residences unless an arrest has occurred disregards the important officer safety interest recognized in *Terry* and its progeny without good reason, and such a rule could endanger law enforcement officers in some situations. Thus, the Court finds that a protective sweep that is not part of a search incident to arrest is not per se unreasonable. For the same reasons, a protective sweep is not unreasonable simply because the officers were invited into the residence.[8]

---

**7.** One of the three circuits with decisions that support Defendant's arguments, the Ninth, has had at least one panel adopt the contrary position. *Compare United States v. Reid,* 226 F.3d 1020 (9th Cir.2000), *with United States v. Garcia,* 997 F.2d 1273 (9th Cir.1993).

**8.** There are legitimate concerns raised by some courts and implied by Defendant, (Docket 66 at 6–7), that officers may gain entry to a suspect's home with consent and use a protective sweep as a pretext to conduct a warrantless search for evidence. However,

The Court, therefore, must balance Defendant's right to be free from unwarranted invasions into his privacy with the officers' need to protect themselves from unknown dangers in the hotel room. The Court assumes, for the purposes of adjudicating the pending motion, that Defendant had a sufficient privacy interest in the hotel suite to exclude the officers. *See supra* note 6. The determinative inquiry is whether the officers' protective sweep was justified by a reasonable articulable suspicion that a threat lurked elsewhere in the suite.

 The government bears the burden "to articulate facts sufficient to support reasonable suspicion." *United States v. Burton*, 228 F.3d 524, 528 (4th Cir.2000) (citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). After a careful de novo review of the transcript of the July 29 hearing, *see Wimmer v. Cook*, 774 F.2d 68, 76 (4th Cir.1985), it is evident the government has met this burden. The four officers proceeded to Defendant's hotel room on April 11, 2008, knowing that the persons occupying the room were not who they claimed to be. The room was registered to a Kentucky resident who had reported to the FBI that he was vacationing in Florida at that time and that his credit card company informed him that a credit card in his name had been requested with the hotel listed as the address. Thus, the officers had reason to be believe that the hotel room was being used for criminal activity. The officers also were told by hotel staff that at least two suspects, both male, had been occupying the room and that both suspects likely were present in the room at the time the officers arrived to investigate.

The testimony of all parties is consistent that a not insignificant period of time elapsed between the officers' first knock on the hotel door and their entry. Defendant then opened the door and allowed the officers to enter. The officers observed only Defendant in the sitting room. From their viewpoint upon entry, the officers could see into part of the bedroom, but they did not observe any other persons. Although the officers' testimonies vary slightly with regard to certain details, each officer indicated that Special Agent Yansick initiated conversation with Defendant. Defendant gave the name of the Kentucky resident when asked his name, which indicated to the officers that Defendant was attempting to deceive them. While Special Agent Yansick was speaking to Defendant, the three other officers were watching for other threats. Special Agent Schwartz testified:

> I wasn't paying attention to [Defendant] as much as ... worrying about what was in the other danger areas in the room. There was a bathroom. There was a bedroom in the back. I was more concerned about what was in those areas.... I was worried about covering [the other officers'] backs.

(Tr. at 76.)

Shortly into the conversation, likely within half a minute of entry,[9] Special Agent Yansick asked if anyone else was in the suite. Defendant responded that his boyfriend was in the bedroom. Special Agent Schwartz and Detectives McClure and Priddy entered the short hallway leading to the bedroom and bathroom, both of which had open doors at the time. The officers looked into the bathroom and en-

---

a faithful application of *Buie, Terry,* and *Long*'s reasonable articulable suspicion standard to the officers' conduct should ferret out abusive uses of protective sweeps.

**9.** Special Agent Yansick testified that "within the first thirty seconds or so Mr. Davis told us there was someone else in the back room and then we went back there." (Tr. at 54.)

tered the bedroom. There they encountered Hoffman in the bed. They ordered Hoffman to show his hands, but did not otherwise physically restrain him. They began to question Hoffman at this time. The incriminating mail and computer were spotted in plain view in the bedroom. Until consent was given later, no closets or other containers were opened.

Special Agent Schwartz described the reason for the entry into the back bedroom as follows:

[A]t that time, for my safety and everybody else's safety I proceeded to walk the ten feet or so into the bedroom, into the bathroom, looked into the bathroom. Nobody was in there. Then I walked into the bedroom.... I was worried about that other individual or individuals for my safety and my partner's safety. So I was wanting to get him in sight and see what type of individual or individuals were back in that room because I was, I was concerned.... [O]ver the years in this business I've had a lot of people jump out from closets, bathrooms, bedrooms, and attack me, you know. And being in a lot of training in that ... if there's other individuals in the house when criminal activity is going on, we have to locate that person and at least control him.... Just, just eyeball them up, make sure that ... they don't have any weapons on them so they're in your presence so you can see them, you can see their hand. You can see what they're up to.

(Tr. at 76–78.)

Detective McClure's testimony was similar: "Myself, Detective Priddy, and Agent Schwartz, we proceeded to go to the back of the suite basically for a protective search, officer safety." (Tr. at 112.)

When asked why he responded to the bedroom, Detective Priddy stated, "You never want to take a risk on possibly getting someone hurt. I had no idea if ... this other person, if they were in the corner, in the bed, if they had a gun, if they didn't have a gun." (Tr. at 142.)

In summary, the officers found themselves in a small, three-room hotel suite. They encountered one subject and believed that at least one more subject was in the room, but out of sight. A not insignificant time had elapsed between when they announced their presence at the door and when they entered the room—certainly enough time for the unseen subject or subjects to prepare an attack. The subject they encountered when they first entered the room, Defendant, was being deceptive about his identity. Defendant then informed them that another person, who was not visible, was in the suite. Although the officers were present on suspicion of identity theft and mail fraud, which are not crimes of violence, the officers had no prior knowledge of the subjects and had no reason to know that they were not violent individuals. Thus, the officers' assertions that they believed that their safety necessitated a quick and cursory investigation of the other rooms of the suite are supported by reasonable articulable suspicion.

■ Furthermore, the officers' protective sweep was properly limited in scope. The officers looked into the bathroom, and finding no one, they proceeded into the bedroom. According to the officers' testimony, no closets were opened, nor were any containers opened during the sweep. The areas searched included only those areas in which a person might be hiding [10]

---

**10.** Even if Defendant's testimony was correct and the officers looked in the closets, the scope of the sweep would have been proper because protective sweeps include "those places in which a person might be hiding." *Buie,* 494 U.S. at 327, 110 S.Ct. 1093.

and the officers' method of search was visual inspection.

Because the officers were justified in conducting a protective sweep, and because the sweep was properly limited in scope, any evidence observed during the sweep was subject to seizure. Upon entering the hotel bedroom, the officers observed U.S. mail resting in an open trash can and spilling out of an overfull satchel. The officers also spotted Defendant's computer resting on the bed. Consequently, these items of inculpatory evidence were properly seized under the plain view doctrine.

■■■ Defendant argues that the magistrate judge erred by crediting the officers' testimony over Defendant's. In Defendant's version of events, the officers immediately rushed into the back bedroom and opened the closet doors, where they found the inculpatory evidence. The Court has reviewed the record in this case thoroughly and can find no reason to disturb Magistrate Judge VanDervort's credibility determinations or factual findings. *See United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("[I]n providing for a 'de novo determination' rather than a *de novo* hearing [in 28 U.S.C. 636(b)(1) ], Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations."). The officers' testimony is consistent in all material respects and the differences are most likely attributable to minor defects in the officers' recollection. Moreover, none of the minor inconsistencies give this Court reason to doubt the veracity of the officers who testified. In contrast, there are reasons to doubt Defendant's credibility. For example, Defendant admitted to twice lying to the officers about his identity during the April 11 incident. (Tr. at 180.)

The Court **FINDS** that the officers were properly in the hotel room based on Defendant's consent; that their protective sweep was supported by reasonable articulable suspicion of a potential threat to their safety; that the scope of the protective sweep was properly limited; and that the evidence seized was in plain view. Accordingly, Defendant's second objection is **OVERRULED.**

### 3. Remaining Objections

For the reasons stated above, the evidence Defendant seeks to exclude was discovered pursuant to a valid protective sweep. It is immaterial that the officers did not first obtain Defendant or Hoffman's consent to search the hotel suite. Accordingly, Defendant's first and third objections are **OVERRULED.** The evidence seized on April 11, 2008, was obtained lawfully, and no subsequently obtained evidence is tainted as fruit of the poisonous tree. Defendant does not argue in his objections that the April 10 entry in his hotel room tainted the evidence seized on April 11 or acquired thereafter. Thus, Defendant's fourth objection is **OVERRULED.**

### III. CONCLUSION

The Court **ADOPTS** Magistrate Judge VanDervort's PF & R and **DENIES** Defendant's suppression motion [Docket 47].

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

### PROPOSAL AND RECOMMENDATION

R. CLARKE VanDERVORT, United States Magistrate Judge.

Pending is Defendant's Motion to Suppress Evidence filed on July 16, 2008.

(Document No. 47.) On July 21, 2008, Defendant filed a Memorandum in Support of his Motion (Document No. 50.), and the United States filed a Response to Defendant's Motion (Document No. 51.). Defendant filed a Reply to the United States' Response on July 28, 2008. (Document No. 54.) The undersigned held a hearing upon Defendant's Motion on July 29, 2008. The United States introduced the testimony of Special Agents Michael A. Yansick and Terry Schwartz of the FBI; Corporal James H. Blume, III, Detective Corporal Samuel L. McClure, Jr., and Detective Frank Priddy of the Beckley Police Department; and United States Postal Inspector Jonathan D. Speck. Defendant introduced the testimony of Mr. Roger Martin, Manager of the Holiday Inn Suites and Country Inn Suites in Beckley, West Virginia, and Defendant testified.

## FACTUAL BACKGROUND

Defendant and his co-Defendant, Mr. Hoffman, are charged in a Seven–Count Superseding Indictment (Document No. 30.) with engaging with and aiding and abetting each other in a scheme to obtain credit cards fraudulently in the names of other individuals and causing the credit cards to be sent by mail to them at a hotel in Beckley, West Virginia, in violation of 18 U.S.C. §§ 1341 and 2 (Counts One through Three) and using and aiding and abetting each other in using the identities of others without their authority during and in relation to the violation of 18 U.S.C. § 1341 in violation of 18 U.S.C. §§ 1028A and 2 (Counts Four through Seven.).

By his Motion to Suppress Evidence (Document No. 47.), Defendant asserts that "[t]here are numerous problems with the manner in which the search of the defendant's hotel room and subsequent seizure of incriminating evidence was undertaken in this case. At no time, did any police officers obtain a search warrant for the contents of room 107 from any state or federal court. The searches which were conducted on April 10 and April 11, 2008, were illegal because no consent (oral or written) to search was ever obtained from defendant. The defendant has standing to challenge the two searches as he was a paid guest of the Holiday Inn at the time of both searches." (*Id.,* p. 3.) Defendant further asserts that all evidence obtained after the searches of his hotel room on April 10 and 11, 2008, and his arrest on April 11, 2008, including mail seized by the United States Postal Service and opened pursuant to a search warrant and information obtained by a forensic examination of a laptop computer seized during the search of Defendant's hotel room on April 11, 2008, pursuant to a search warrant are "fruit of the poisonous tree." (Id., p. 4.) Defendant attaches as Exhibits to his Motion to Suppress Evidence a copy of the following:

A. A hotel registration form indicating that Room 107 was rented from April 8 to 12 in the name of a Kentucky resident;

B. hotel document indicating phone calls made from Room 107 on April 9, 2008;

C. Photographs of Room 107 of the Holiday Inn Hotel and Suites, Beckley, west Virginia;

D. An "Advice of Rights" form signed by Defendant indicating that he refused to give a statement and requested an attorney;

E. *United States v. Bass,* 41 Fed.Appx. 735 (6th Cir.2002);

F. An Application and Affidavit for Search Warrant of Jonathan D. Speck, United States Postal Inspector dated April 22, 2008, covering 9 pieces of mail and designated Case Number 5:08–mj–0038; and

G. An Application and Affidavit for Search Warrant of Jonathan D. Speck, United States Postal Inspector dated April 22, 2008, covering a Dell laptop computer and designated Case Number 5:08–mj–0039.

In his Memorandum in Support of his Motion to Suppress Evidence, Defendant contends that police searches of the hotel room where he and his co-Defendant were staying on April 10 and April 11, 2008, "were illegal as both were conducted without search warrants or the express consent of the defendant." (Document No. 50, p. 1.) Defendant states that "[a]s a result, this Court should suppress all physical evidence of stolen mail and other documents which were recovered from the hotel room on April 11, 2008. The fruit of the poisonous tree doctrine would apply in this case and warrant the suppression of subsequent U.S. mail which was addressed to the defendant's room and the results of forensic examination of a laptop computer." (*Id.*) Defendant urges that by merely opening the door and allowing officers to enter his hotel room on April 11, 2008, he did not "express consent to permit a search of the room. . . ." (*Id.*, p. 8.) Defendant further contends that because the searches of his hotel room were illegal, mail sent to the room and thereafter seized by the United States Postal Service and evidence developed through a forensic examination of a laptop computer seized during the April 11, 2008, search are "fruit of the poisonous tree" and may not be admitted at trial pursuant to the exclusionary rule. (*Id.*, pp. 8–9.)

By its Response to Defendant's Motion to Suppress Evidence (Document No. 51.), the United States asserts that (1) phone and guest registration records maintained by the hotel may not be suppressed (*Id.*, pp. 4–5.); (2) Defendant voluntarily consented to the search of the hotel room on April 11, 2008, and the search was therefore constitutional (*Id.*, pp. 5–9.); (3) Mr. Hoffman's statement may not be suppressed (*Id.*, p. 9.); and (4) mail received for Defendant by the hotel in the name of other persons who were victims of the crimes with which Defendant is charged herein and seized and opened by the United States Postal Service with the consent of the senders and victims and pursuant to a search warrant may not be suppressed (*Id.*, pp. 10–12.).

By his Reply to the United States Response (Document No. 54.), Defendant asserts that the United States Postal Service's seizure of mail after the April 11, 2008, search of Defendant's hotel room and arrest "was not based upon information obtained from a new independent source, but *solely* upon information learned as a result of the illegal search. Likewise the government proceeded to obtain this Court's permission to conduct a forensic examination of the seized laptop computer based upon information learned as a result of the illegal search, and not an independent source." (*Id.*, p. 4 (Emphasis is Reply.).)

The undersigned held an evidentiary hearing upon Defendant's Motion to Suppress on July 29, 2008. Special Agent Yansick testified that at around 4:00 p.m. on Thursday, April 10, 2008, he was contacted by an Agent in the FBI's Pittsburgh Division and informed that a Kentucky resident reported that a person applied for a credit card using the Kentucky resident's name and indicating that his address was room 107 of the Holiday Inn in Beckley, West Virginia. Special Agent Yansick spoke with the Kentucky resident. Having no other FBI Agents available, Special Agent Yansick then contacted the Beckley Police Department and went to the Holiday Inn to investigate. He met Corporal James H.

Blume, III, of the Beckley Police Department there. Special Agent Yansick and Officer Blume went to the front desk and spoke to the manager, Mr. Roger Martin. Mr. Martin gave them a copy of the room registration form. The form indicated that the same person(s) rented the room under one name and then changed the name to that of the Kentucky resident. Finding several other things unusual about the information contained in the form, Special Agent Yansick asked Mr. Martin where the room was, and Mr. Martin took the Officers to it. A cleaning person told them two persons were occupying the room and she had cleaned the room within the hour and thought the persons were in the room. The Officers knocked on the door and got no response. Mr. Martin opened the door for them then, and they entered the room announcing that they were police officers. When asked why they entered the room, Special Agent Yansick testified that "[b]ased on the circumstances, I thought the subjects were in the room. The fact that they had credit cards would make them easy to destroy. I thought possibly while we were talking to the hotel manager in the lobby these subjects saw us and were destroying the evidence." The Officers looked around the room to make sure the persons were not in the room and left.[1] They did not search the room, notice anything in particular or take anything. They told Mr. Martin that they would probably be back the next day. Special Agent Yansick testified that they were in the room for "[t]en to 15 seconds." Corporal Blume of the Beckley Police Department testified respecting what occurred on April 10, 2008, as he accompanied Special Agent Yansick in inquiring about and looking for the person(s) in room 107 at the Holiday Inn. Corporal Blume's testimony was substantially the same as Special Agent Yansick's. Mr. Martin testified that on April 10, 2008, Special Agent Yansick and Corporal Blume were in the room "three to five minutes at tops. It wasn't very long." He testified that they "open[ed] the closets, check[ed] in the bathroom, ... checked behind the entrance door."

On Friday, April 11, 2008, Special Agent Yansick returned to the Holiday Inn with his partner, Special Agent Schwartz, and Beckley Police Department Detectives McClure and Priddy. The Officers went to the front desk and learned that the persons continued to rent the room and were believed to be on the property. The Officers went to the room. Their plan was to "talk to the subjects, see if we could identify them, and go from there, handle the investigation from there." Special Agent Yansick knocked on the door. There was no response. Detective Priddy then knocked on the door "a little harder". A person in the room later determined to be Defendant asked, "Who is it?" Detective Priddy answered, "Police." When Defendant asked what they wanted, Detective Priddy said that the Officers needed to talk to him. Defendant opened the door with the chain or security lock engaged and looked out. Special Agent Yansick and Detective Priddy showed him their credentials. Defendant asked again what they wanted, and they said that they wanted to talk to him. Defendant closed the door, disengaged the security chain or lock

---

1. As the record indicates and photographs introduced by Defendant depict, room 107 of the Holiday Inn actually is three rooms. Upon entering the door, there is a sitting room. A short hallway on the other side of the sitting room from the entrance leads to the bedroom and bathroom area. There are two beds in the bedroom. There is a small closet in the hallway between the sitting room and the bedroom.

and opened the door. Defendant asked to see credentials and Special Agent Yansick showed him his. Special Agent Yansick asked him his name, and he gave the name of the Kentucky resident. Special Agent Yansick stated, "we need to speak to you. Do you mind if we come in?" Defendant said "No." and let the Officers enter the room. Upon entering the room, Special Agent Yansick asked Defendant to sit down in the sitting area and asked again who he was. Defendant again gave the name of the Kentucky resident. Special Agent Yansick told him that he knew he was not the Kentucky resident and advised him not to lie to him. He asked if anyone else was in the room, and Defendant said that another person was in the bedroom. Defendant gave Special Agent Yansick another name which turned out to be false as well. When Defendant stated that there was a person in the bedroom, the other Officers went into the bedroom and found Mr. Hoffman in one of the two beds there.[2] Special Agent Yansick testified on cross examination that "I think within the first 30 seconds or so Mr. Davis told us there was someone in the back room and then we went back there. I believe the officers kept an eye on the back room, but I don't think they went back there until he told us there was someone back there."

The other Officers learned Defendant's real name in speaking with Mr. Hoffman in the bedroom. Mr. Hoffman also advised that Defendant was wanted in Oklahoma. In speaking with Special Agent Yansick about this, Defendant admitted what his real name was. He stated that he knew there were criminal charges against him in Oklahoma but was not

aware of the arrest warrant. Detective McClure then did a computer search respecting Defendant's name and learned that there was a warrant for his arrest in Oklahoma. Special Agent Yansick testified that 10 to 15 minutes into his conversation with Defendant "I asked him if he'd mind if we looked around. He stated go ahead. I advised him that he did not have to give me consent if he did not want to. And he said, no, go ahead. Actually I think he said 'whatever' and kind of waved his hand up." Special Agent Yansick stated that Defendant "raised his hands above his head and kind of like waived." Special Agent Yansick did not ask Defendant to sign a written consent form or tape record his verbal consent to search. Special Agent Yansick testified that he and the other Officers then "looked around a little bit. Agent Schwartz had already advised that he saw a lot of mail. Agent Schwartz advised me that he saw the—there was a trash can sitting in the middle of the room with mail overflowing from it. He also saw sort of a blue bag that he saw mail sticking out of that. * * * Because we thought he was doing identity theft and Agent Schwartz said from looking at the mail, he could see it was from various states and it wasn't in the name, any of the names he provided. Some of it was stolen mail he assumed." Special Agent Yansick testified that the Officers seized all of the mail and a computer which was on the bed in which Mr. Hoffman was found. Detectives McClure and Priddy then arrested Defendant as a fugitive from justice in view of the Oklahoma arrest warrant. Having obtained Defendant's consent, the Officers also searched his vehicle. Defen-

2. Special Agent Yansick testified that his conversation with Defendant was "casual. There were no threats. There was no yelling." Special Agent Yansick did not draw his weapon and did not see any of the other Officers do so. Defendant was coherent and unimpaired and appeared to understand who the Officers were and what they were doing. Throughout his "interview" and until after the Officers' search of the room, Defendant was not restrained. He was not placed under arrest or in custody.

dant was taken to the Beckley Police station, charged and processed. He was mirandized and chose not to give a statement.

Special Agent Schwartz testified respecting his involvement with Special Agent Yansick and Detectives McClure and Priddy on April 11, 2008. Special Agent Schwartz' testimony respecting what transpired through the time when the Officers entered Room 107 and Special Agent Yansick began talking with Defendant was consistent with Special Agent Yansick's. Special Agent Schwartz testified that "[w]hat I recall is they were on the couch ... because I wasn't paying attention to them as much as ... worrying about what was in the other danger areas in that room. There was a bathroom. There was a bedroom in the back. I was more concerned with what was in those areas because Officer Priddy and Agent Yansick had Mr. Davis ... there and he was cooperating. They were engaged in conversation. I was more worried about covering these guys' backs." Special Agent Schwartz "just stood there and looked, just kept an eyeball on the bathroom area and the bedroom area." He did so until he heard that there was another person in the bedroom. Special Agent Schwartz testified that "we were in that little living room area in the initial entry of the, entrance of the hotel room probably, I'd say about, approximately two minutes, right around two minutes, maybe even a little less before I heard that there was another individual in that room." Special Agent Schwartz testified that in the interest of safety, he and Detective Priddy then went through the hallway past the bathroom and into the bedroom where Mr. Hoffman was in bed. Detective Priddy spoke with Mr. Hoffman while Special Agent Schwartz "just stood in the room and helped Officer Priddy maintain visual control of this individual." Special Agent Schwartz noted a trash can and a blue canvass type bag or satchel with letters and mail spilling out of them at the foot of the bed which Mr. Hoffman was in. Special Agent Schwartz testified that both Defendant and Mr. Hoffman verbally consented to the search of room 107 and their belongings and vehicle on direct examination as follows:

AUSA Goes: At any point did you receive permission to, to look around the room or search the room?

Yeah. After we had, After everything was—everything was in plain view in that hotel room. All the letters and the computer that we took was on that other bed in plain view. And Mr. Hoffman was telling us that, hey, Mr. Davis was on that computer with these banks applying for a credit card. So, everything that we—prior to, prior to us even looking any further, everything we discovered was in plain view and he had told us go ahead. You can look around as much as you want.

Who told—I'm sorry to interrupt you. Who told you that?

Both Mr. Hoffman and Mr. Davis.

And what did they specifically say?

You go ahead and look for anything you want. You can look through my vehicle, which we did, out in the parking lot, Mr. Davis's vehicle. He gave us keys. He gave us permission to look there in the vehicle. And, but nothing was, nothing was found other than the stuff that was in plain view after they gave us permission to search further, the suitcases. And I don't think—I think all their belongings were on the bed. Everything was on that spare bed. There was nothing anywhere else. So. We looked through their clothing and their suitcases and I think that's all they had. They had some duffel bags, some type of gym bags or duffel bags with dirty clothes

and normal trip stuff you have with you. But, but after they gave us consent to search that stuff after the other stuff was already discovered in plain view.

Special Agent Schwartz testified respecting Defendant's consent to search on cross examination as follows:

AFPD Bungard: Well, is it fair to say that you did not notice the mail in the duffel bag until you got back to that bedroom?

That's correct, yes, uh-huh, yes.

And when you went back to that bedroom area you had not obtained the consent of Mr. Davis or anyone else to go back in that room, correct?

No, he didn't give us consent at that time. But for my, for officer safety, for my safety and my partner's safety when they said there was another body back in that room, it was for protection that I went back in that room to see what was in that room, how many or who was in that room.

Detective McClure's remembrance of what transpired on April 11, 2008, was consistent with Special Agents Yansick's and Schwartz' respecting the circumstances through the time when the Officers entered Defendant's hotel room. He indicated that upon entering the room Special Agent Yansick asked Defendant if anyone else was in the room and Defendant stated that Mr. Hoffman was. He testified that "just a few seconds" after they entered the room, without asking Defendant's consent, "[f]or officer safety we went ahead and responded to the back part of the suite. He was still located in the second bed." As Special Agent Schwartz and Detective Priddy were speaking with Mr. Hoffman, Detective McClure returned to the sitting room where Special Agent Yansick was speaking with Defendant. Detective McClure conducted background checks based upon information which Defendant

was giving Special Agent Yansick respecting his identity. Detective McClure testified that when Defendant's true identity was learned and it was determined that he was wanted upon charges in Oklahoma and Oklahoma would extradite, Defendant was taken into custody on the fugitive warrant. Detective McClure testified as follows:

AUSA Goes: [A]t what point was he handcuffed?

After the search of the, the consent to search of the hotel room was given, after it was completed, after the agents had finished speaking with Mr. Davis and the other subject and before he had exited the hotel room, he was taken into custody.

So, you mentioned a consent to search. When did this happen?

After we had initially come into the hotel room after being let in by Mr. Davis, after doing a protective search of the hotel room to see if there was any other suspects there that might be armed or might present reasonable dangers to the officers and when I came back to check on Agent Yansick, he had asked Mr. Davis would it be okay if there was anything else inside of the hotel room, any type of illegal weapons, anything like that and he stated no, no, there was not. And he asked would it be okay if we looked around and the defendant stated, you know, whatever.

And when the defendant stated "whatever", was he under arrest at that point?

No, sir.

Did you assist with the search of the room?

Yes, sir.

What, if anything, did you find?

Initially, when we went to, back towards the back part of the suite to do the protective officer search to make sure there was, basically if there was anyone

else in the back of the suite and for officer safety, in plain view I observed a lap-top that was on the first bed which would have been to the left side of the room. Also there was a blue satchel type bag also laying on the bed. The top flap was closed and there was mail protruding from the inside of the bag. Also on the dresser which would have been located to the right side of the back part of the suite there was a pile of mail that was sitting on top in plain view. Detective McClure testified that he did not open the closet door of the closet in the hallway leading to the bedroom. He stated that "[b]est of my recollection that closet door was ajar when we came through there before."

Detective Priddy's testimony was consistent with Special Agents Yansick's and Schwartz' and Detective McClure's. Detective Priddy testified that he understood that two people were occupying room 107 before the Officers went to the room. Soon after Defendant allowed the Officers' entry into the room, Defendant confirmed that there was another person in the room. Without Defendant's consent, Detective Priddy went into the bedroom in the interest of "[o]fficer safety" and found Mr. Hoffman there. After Special Agent Yansick and Detective McClure learned based upon Defendant's true identity that there was a warrant for his arrest in Oklahoma,

> [t]hey got consent to search from the defendant who's present. At that point, we did ask the young man in the bed since they were sharing the room, I asked him, I said do you mind if we check around? He said that's no prob-

lem. Go right ahead. Visibly on the floor was the attache case or a small bag that had just tons of mail coming out of it. And we opened that, looked at that mail. There were several different names, different places, different states. There was also a plastic bag full of mail. There was mail on the bed beside the computer. So, there was all kinds of different . . . mail items laying around.

Detective Priddy testified that Defendant consented to the search of the room after a period of time after the Officers entry into the room of ". . . probably five minutes or so. It could be longer. It could be . . . shorter. It was quite some time before we did look through the room. . . ." Detective Priddy stated that he saw "mail laying on the floor to the lower part of the bed. There was a computer and other mail, clothing items laying on the bed." Detective Priddy also testified that he did not look inside the hallway closet.[3]

Postal Inspector Speck testified that Special Agent Yansick contacted him about the matter on April 11, 2008. He traveled to Beckley, met Special Agents' Yansick and Schwartz and examined the evidence which they had obtained and spoke with Mr. Hoffman. Postal Inspector Speck took custody of the evidence including the computer. He also learned that mail would be delivered to the hotel deriving from Defendant's and Mr. Hoffman's activities and made arrangements to obtain it. He took custody of eleven pieces of mail. Two were from credit card companies, and Postal Inspector Speck obtained permission from the companies to open them.

---

**3.** The undersigned notes that while the testimony of the Special Agents Yansick and Schwartz and Detectives McClure and Priddy was consistent with respect to the order in which the events occurred, it was inconsistent in some respects as the District Court may gather from the summary above. The District will note differences or inconsistencies in the Officers' estimations of how much time elapsed as they proceeded through the events. Additionally, the Officers' testimony was inconsistent respecting where they found Mr. Hoffman in the bedroom and where they observed the computer and mail there.

He applied for warrants to search respecting the remaining nine pieces of mail and the computer, and the undersigned issued the warrants.

Defendant testified that he woke upon hearing knocks at the door on August 11, 2008, and he went to the door to see who was there. Upon asking who was there, he was informed that it was "[g]uest services at first." Then, looking through the peephole, he asked again and was informed that it was the police or the FBI. Defendant testified that he then went back to wake up his co-Defendant and put the blue bag and the trash can in the closet in the passageway from the sitting room to the bedroom. Defendant testified that he then went back to the door and opened it slightly with the security device engaged. When the officers told him to open the door, he disengaged the security device and opened the door. The officers entered. Defendant testified that "the first officer, Yansick, walked in and the other three went running to the back bedroom. And one officer [Detective McClure] had a gun drawn." Defendant acknowledged giving false names to Special Agent Yansick until one of the other Officers told Special Agent Yansick Defendant's real name. Defendant stated that Special Agent Yansick did not advise him of his Miranda rights or ask if the Officers could search the room. Defendant testified that when the Officers learned Defendant's real name, they searched NCIC and found that there was warrant for his arrest in Oklahoma. Defendant stated that though he was not asked and therefore did not give consent to search the room, Detective McClure opened the closet door twice and the second time found the blue bag and the trash can full of mail. Defendant was arrested and taken to the Beckley Police station, and there he was advised of his Miranda rights, refused to give a statement and requested an attorney.

### DISCUSSION

▬ The Fourth Amendment of the United States Constitution states that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment prohibition against unreasonable searches and seizures applies with respect to guests or occupants of hotel rooms. *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964)(Warrantless search of an unoccupied hotel room based only on the consent of the hotel night clerk is unconstitutional.); *United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir.1997); *United States v. Thomas*, 955 F.2d 207, 208 (4th Cir.1992)(United States conceded that officers' first search of unoccupied hotel room with entry gained by use of hotel maid's key was illegal.); *United States v. Arias*, 992 F.Supp. 832, 836 (S.D.W.Va.1997)(District Judge Goodwin), *aff'd*, 176 F.3d 476 (4th Cir.1999)(unpublished), *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). Unless the period of occupancy of a hotel room has expired or ended or been terminated by the occupant's eviction, guests or occupants of hotel rooms have a legitimate expectation of privacy therein even if they have obtained their hotel rooms by fraud. *United States v. Bautista*, 362 F.3d 584, 590 (9th Cir. 2004)(A stolen credit card number was used to reserve room); *United States v. Bass*, 41 Fed.Appx. 735 (6th Cir.2002)(Defendant had a privacy interest in hotel room though he obtained the room using a counterfeit driver's license).

▬ Warrantless searches are *per se* unreasonable unless the United States shows that the search falls within an established exception. *Coolidge v. New*

*Hampshire,* 403 U.S. 443, 454–455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). One such exception to the warrant requirement is when a search is conducted with the person's voluntary consent. *United States v. Matlock,* 415 U.S. 164, 165–166, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Nanda,* 178 F.3d 1287, *5, 1999 WL 294548 (C.A.4 (Va.))(unpublished). Whether consent was given voluntarily or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of circumstances. *Schneckloth v. Bustamonte,* 412 U.S. at 248–249, 93 S.Ct. at 2059. "Consent may be inferred from actions as well as words." *United States v. Hylton,* 349 F.3d 781, 786 (4th Cir.2003), *cert. denied,* 541 U.S. 1065, 124 S.Ct. 2391, 158 L.Ed.2d 966 (2004). The United States bears the burden of proving by a preponderance of the evidence that consent was voluntary. *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2059.

In considering the totality of the circumstances, the person's age, education and apparent intelligence, whether the person was advised of his right to refuse consent, indications that the person was under duress or coerced, whether the person believed that no incriminating evidence would be found and the extent and level of the person's cooperation with the police are relevant. Mere acquiescence when confronted by a police officer is not sufficient to prove voluntary consent. *Bumper v. North Carolina,* 391 U.S. 543, 548–549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Nor is actual consent required. Consent may be determined on the basis of a persons words and actions. In determining whether consent was given for a warrantless search, the focus is upon "what a reasonable person would have understood by the exchange between the officer and the suspect." *United States v. Williams,* 521 F.3d 902, 906–907 (8th Cir. 2008); *United States v. White,* 339 F.Supp.2d 1165, 1172 (D.Kan.2004). If the police officer did not advise the person of their right to refuse consent, it may be evident that the person was unaware of the right and/or was coerced in some manner to consent. *United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consent is not rendered involuntary, however, merely because the police officer does not advise the person that he or she can refuse to give it. *United States v. Analla,* 975 F.2d 119, 124 (4th Cir.1992), *cert. denied,* 507 U.S. 1033, 113 S.Ct. 1853, 123 L.Ed.2d 476 (1993); *United States v. Wilson,* 895 F.2d 168, 172 (4th Cir.1990).

When voluntary consent is established, the scope of the consent may become a consideration. "The scope of a search is generally defined by its express object." *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The consent may be limited to specific items or places. *United States v. McFarley,* 991 F.2d 1188, 1191 (4th Cir. 1993)("While consent generally has its limits, a consensual search or seizure within those limits does not implicate constitutional rights.") The scope of the voluntary consent is determined under an objective standard. *Florida v. Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1804 ("[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?"). When there are two guests or occupants of a hotel room, either occupant may give consent if they both have actual or apparent common authority over the room. *United States v. Matlock,* 415 U.S. 164, 171 fn. 7, 94 S.Ct. 988, 993 fn. 7, 39 L.Ed.2d 242 (1974)("The authority which justifies the third-party consent

does not rest upon the law of property, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants ·has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (Citations omitted.)); *United States v. Caldwell,* 518 F.3d 426, 429 (6th Cir.2008), *cert. denied,* — U.S. ——, 128 S.Ct. 2985, 171 L.Ed.2d 905 (2008).

Another exception to the warrant requirement is when incriminating evidence is in the plain view of an officer. *Horton v. California,* 496 U.S. 128, 136–137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). An officer may seize incriminating evidence in plain view without a warrant or consent as long as the officer arrives in the place where the evidence is plainly viewed without violating the Fourth Amendment and the incriminating nature of the evidence is immediately apparent. *Horton,* 496 U.S. at 136, 110 S.Ct. at 2308. An officer does not violate the Fourth Amendment by conducting a limited protective sweep of an area when the officer reasonably believes that there are other persons there who may pose some danger. *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990)("[T]here must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."). *See United States v. Stublefield,* 758 F.Supp. 1203 (E.D.Mich.1991)(Suppression of evidence of credit card fraud discovered in plain view as police made a protective sweep of a residence denied); *United States v. Corbin,* 494 F.Supp. 244 (D.C.N.C.1980)(Offi-

cers having lawfully entered motel room in the course of a drug investigation were justified in making protective search of adjoining room and seizing revolver in plain view on the floor.).

Yet another exception to the warrant requirement is when exigent circumstances justify a warrantless, non-consensual entry and search of a premises. The Fourth Circuit has identified five factors which District Courts should consider in determining whether exigent circumstances existed at the time a warrantless search commenced:

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that police are on their trail; and (5) the ready destructibility of the contraband.

*United States v. Mowatt,* 513 F.3d 395, 399 (4th Cir.2008) (Citations omitted.).

■ Though it appears that Defendant obtained room 107 in the name of another person, he was nevertheless its occupant and had a legitimate expectation of privacy in it on April 10 and April 11, 2008. The evidence is not sufficient to support a finding that exigent circumstances justified Special Agent Yansick's and Corporal Blume's warrantless entry and search of the room with Mr. Martin's assistance on April 10, 2008. Their entry and search of the room on April 10, 2008, was unconstitutional under *Stoner v. California.* The officers, however, obtained no information or evidence in entering and searching Defendant's room beyond what they had beforehand. There should therefore be no suppression of evidence as a consequence

of their unconstitutional entry and search of room 107 on April 10, 2008.

The Officers had no warrant again on April 11, 2008, when they went to Defendant's hotel room. The Officers' entry and search of the room must be deemed unconstitutional unless the United States has demonstrated that Defendant voluntarily consented, evidence of criminal activity was in plain view and/or exigent circumstances existed. As a practical matter, the circumstances under which an exception to the warrant requirement may develop are kaleidoscopic. Taking the circumstances in the sequence in which they occurred, it is evident that upon solid information that the occupants of room 107 of the Holiday Inn were engaging in credit card fraud, the Officers went to that room on April 11, 2008, found Defendant there and indicated that they needed to talk to him. A preponderance of the evidence indicates that Defendant confirmed the Officers' identities, opened the door and consented to the Officers' entry into the sitting area of his hotel room. Soon after entering the sitting area of the hotel room, the Officers learned that Mr. Hoffman was in the room. Without Defendant's consent and before Defendant was taken into custody, the Officers went further into the adjoining rooms to find Mr. Hoffman in bed. When the Officers learned that Mr. Hoffman was in room 107, a limited protective search of the room was constitutional permissible. A preponderance of the evidence further indicates that as they proceeded, they saw mail in plain view and, having information to believe that De-

fendant was engaging in credit card fraud, reasonably assumed that the mail might be inculpatory evidence of the same. Having arrived at the place where they saw the mail in a manner which did not violate Defendant's constitutional rights, the Officers' seizure of the mail in their plain view without a warrant or Defendant's consent would likewise have been constitutionally appropriate. The Officers nevertheless asked Defendant if they could look around and he said "whatever". While Defendant's response might be construed to indicate his resignation as the four Officers had already entered the room and proceeded to the bedroom upon a protective search for Mr. Hoffman and Special Agent Yansick was challenging him respecting his true identity, it is not evident that Defendant was threatened, coerced or under duress when the Officers asked if they could look around the room. Defendant was not restrained when they asked to look around, and the Officers did not draw their weapons. Rather, the Officers consistently testified that their conversations with Defendant and Mr. Hoffman were "casual" and Defendant and Mr. Hoffman were cooperative. Defendant appeared to comprehend and understand what the Officers were doing. In view of the totality of the circumstances, a reasonable person would have concluded that Defendant did not merely acquiesce in the search of his hotel room but voluntarily consented to it. It was not constitutionally improper for the Officers to search the room further for evidence of Defendant's credit card fraud activity and seize it.[4] For all of these

4. Special Agent Schwartz and Detective Priddy testified that Mr. Hoffman also voluntarily consented to the search of the hotel room. Though their testimony constituted hearsay, hearsay testimony is admissible in suppression hearings, and the Court may resort to it if it is determined to be reliable. *See United States v. Matlock*, 415 U.S. 164,

172–173, 94 S.Ct. 988, 994, 39 L.Ed.2d 242 (1974). Mr. Hoffman occupied room 107 along with Defendant and was in bed there when the Officers found him. The Officers could reasonable assume that Mr. Hoffman had joint control of the room and an expectation of privacy there. Mr. Hoffman was cooperative. A reasonable person could con-

reasons, Defendant's Motion to Suppress Evidence (Document No. 47.) should be denied.

## PROPOSAL AND RECOMMENDATION

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **DENY** Defendant's Motion to Suppress Evidence. (Doc. No. 47.)

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir.1989); *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir.1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir.) *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies

of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to transmit and deliver a copy to counsel of record.

clude in view of these circumstances that Mr. Hoffman had the right, as Defendant did, to consent to the search of the room and did so.